UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

KEVIN LEE FOX,                                    Case No. 2:19-cv-0047

                 Plaintiff,                        Hon. Maarten Vermaat
                                                   U.S. Magistrate Judge
        v.

COMMISSIONER OF SOCIAL SECURITY,

                 Defendant.
_____/

## <u>OPINION</u>

## I.    Introduction

On August 19, 2015, Plaintiff Kevin Lee Fox applied for disability and disability insurance benefits (DIB). (ECF No. 8-5, PageID.241.) Fox suffers from a number of severe impairments, including cramp-fasciculation syndrome, obesity, sleep apnea, and hypertension. He alleged a disability onset date of August 6, 2015. (*Id*.) The Social Security Administration denied Fox's application, and Fox requested a hearing before an Administrative Law Judge (ALJ). (ECF No. 8-4, PageID.165, 173.) ALJ Gauthier conducted this hearing on November 8, 2017. (ECF No. 8-2, PageID.85.) Then, on May 8, 2018, Judge Gauthier issued a decision ruling that Fox was not under a disability from the alleged onset date through the date of decision. (*Id*., PageID.40, 56.)

Fox now appeals Judge Gauthier's decision. (ECF No. 1, PageID.1.) He argues that the ALJ made four errors, all of which relate to the ALJ's assessment of Fox's residual functional capacity (RFC). Fox argues (1) that the ALJ erred by not properly

considering the opinions of Fox's treating physicians, (2) that the ALJ erred in his assessment of the consistency of Fox's statements regarding his symptoms, (3) that the ALJ erred in formulating Fox's residual functional capacity (RFC), and (4) that the ALJ erred by failing to properly consider Fox's obesity.

This Court heard oral argument on March 26, 2020.  (ECF No. 22, PageID.518.) In this case, ALJ Gauthier gave good reasons for giving little weight to the opinions of Fox's neurologist, Dr. Teener.  The ALJ did not question Dr. Teener's diagnoses. Instead, the ALJ found that Dr. Teener's opinions regarding Fox's functional limitations were inconsistent with other evidence in the record, unsupported by medical evidence, and incongruent with the frequency of Fox's visits with Dr. Teener. Substantial evidence supports each of these reasons.   In addition, substantial evidence supports the ALJ's conclusion that Fox's description of the intensity, persistence and limiting effects of his symptoms were inconsistent with the evidence in the record.  Furthermore, the record indicates that the ALJ did not err when he assessed Fox's obesity.  As a result of these conclusions, the ALJ's RFC assessment is supported by substantial evidence.

After careful consideration of the arguments and documents provided by the parties, the Court affirms ALJ Gauthier's decision.

## II.   Summary of Fox's Background and Medical Care and Evaluations During Relevant Period

Fox was born in 1972.  (ECF No. 8-2, PageID.95.)  At the time of his hearing before Judge Gauthier, Fox lived with his wife and three children (ages four, nine, and fourteen) in Sault Ste. Marie, Michigan.  (*Id.*)  Fox was five feet, eight inches in

height and weighed 305 lbs. at the time of the hearing.  (*Id.*)  His medical records indicate that he had been morbidly obese for years.  Fox graduated from high school and took some college classes.  (*Id.*, PageID.99.)  In his last job, he worked as a manager at Wal-Mart.  (*Id.*, PageID.100.)  Fox was terminated in 2015 because he called in sick too many times.  (*Id.*, PageID.102.)

During his hearing before the ALJ, Fox identified cramp-fasciculation syndrome (CFS) as the medical condition that played the most significant role in preventing him from working.  (*Id.*, PageID.103.)

Fox's medical records show that he was seen on multiple occasions by physicians at the neuromuscular clinic at the University of Michigan in Ann Arbor, MI.  First, in January 2014, Fox was examined by Dr. Jason Wong, a Neuromuscular Fellow at the University, and Dr. James Teener.  (ECF No. 8-7, PageID.322.)  Fox reported cramping in his calves during physical activity dating back to February 2013.  (*Id.*)  Dr. Wong conducted what appears to be an extensive physical examination, but did not order any electrodiagnostic tests.  He concluded that Fox "likely has a benign condition known as cramp-fasciculation syndrome" and reassured Fox that he "should be able to return to full work schedule as soon as [his] symptoms are better controlled."  (*Id.*, PageID.325.)  Dr. Wong prescribed carbamazepine and told Fox to return in four months or sooner if needed.  (*Id.*)  Wong also noted that he would consider electrodiagnostic testing if Fox's symptoms did not improve.  (*Id.*)

Dr. Teener noted that he had reviewed and agreed with this plan.  (*Id.*)

3

Fox returned to the neuromuscular clinic at the University of Michigan in May 2014. (*Id.*, PageID.345.) Dr. Wong again conducted a physical examination. (*Id.*, PageID.347.) He noted that Fox was there for a follow-up visit in the clinic for a presumed cramp-fasciculation syndrome. (*Id.*, PageID.348.) Dr. Wong noted in Fox's medical history that he had "[b]enign fasciculation-cramp syndrome." (*See id.*, PageID.346 (patient medical history or PMHx).) According to Dr. Wong, Fox reported that his cramping had decreased in both frequency and severity. Fox also said that his prescription for gabapentin helped "immensely" with the numbness and paresthesias affecting his feet and hands. (*Id.*, PageID.345.) Dr. Wong recommended that Fox continue to take carbamazepine, increase his level of physical activity, lose weight, and return to the clinic in a year, or sooner if needed. (*Id.*, PageID.348.) Wong also noted that Fox did not have an underlying neuromuscular pathology and said that Fox's symptoms should improve with continued activity and weight loss. (*Id.*, PageID.348.) Dr. Wong directed Fox to return to the clinic in a year, or sooner if needed.

Dr. Teener again noted that he had reviewed and agreed with this plan. (*Id.*)

Fox returned to the clinic more than a year later, in June 2015, and saw only Dr. Teener. (*Id.*, PageID.326.) Dr. Teener wrote that Fox's symptoms were "suggestive of a clinical diagnosis of cramp fasciculation syndrome," and that "[t]his can be a very difficult syndrome." (*Id.*) Dr. Teener went on to note

that Fox's symptoms were causing him significant problems in the workplace. (*Id*.)  Dr. Teener noted that Fox was experiencing cramping, pain and fatigue, and could not work.  (*Id*.)  Dr. Teener wrote that Fox was considering pursuing disability and he (Dr. Teener) was supportive of this pursuit.  (*Id*.)  Fox was again directed to return in a year, or sooner if needed.

Dr. Teener's report indicates that this visit lasted some 30 minutes, the majority of which was devoted to counseling and care planning.  (*Id*.)  The medical records from the June 2015 visit to the neuromuscular clinic do not indicate that a physical examination or testing was conducted.

As noted above, Fox applied for disability and DIB in August 2015.

Fox returned to the University of Michigan neuromuscular clinic for his annual follow-up in June 2016.  On this visit, he was seen by Dr. Mundwiler, a resident at the clinic who was also being supervised by Dr. Teener.  Dr. Mundwiler noted that carbamazepine was helping with Fox's cramping, and that gabapentin was helping with Fox's numbness and tingling.  (*Id*., PageID.419.)  Dr. Mundwiler noted that the etiology (causation) of Fox's pain was unclear.  (*Id*., PageID.420.)  He recommended that Fox increase his physical activity, continue taking carbamazepine and gabapentin, try tramadol for pain, try various vitamin supplements for his muscle disorders and for energy production, and return in a year.  (*Id*., PageID.419.)  Dr. Mundwiler's report indicates that Fox had abnormal glucose control with a HgbA1c of 6.2%, and noted that this condition explained Fox's tingling and

may have contributed to his cramping.  (*Id.*, PageID.420.)  Dr. Mundwiler's report indicates that he conducted physical and neurologic examinations. (*Id.*, PageID.420-21.)  Mundwiler's report also lists Fox's diagnoses.  These were neuropathy, "benign cramp fasciculation syndrome," myopathy and type 2 diabetes with diabetic polyneuropathy.  (*Id.*, PageID.419.)

Dr. Teener reviewed Dr. Mundwiler's notes and plan for Fox and agreed.  (*Id.*, PageID.421.)

Dr. Teener completed a six-page RFC assessment form for Fox in October 2016.  (*Id.*, PageID.424-29.)  The form indicates that Fox has significant limitations in his ability to lift and carry objects, and his ability to reach, handle, finger and feel with his hands.  (*Id.*, PageID.424-25.)  The form lists a number of limitations to Fox's ability to carry out various postural activities.  The form also states that Fox could not care for his personal hygiene or sort, handle, or use paper/files.  (*Id.*, PageID.426.)  In response to the form question about the basis for this assessment, Dr. Teener simply wrote "see visit notes."  (*Id.*)

Dr. Teener also included statements about Fox's very limited ability to sit, stand, walk at one time and as part of an eight-hour work day during a 40-hour work week.  He said Fox could sit for 10 minutes at a time, stand for 10-15 minutes and walk for 10 minutes at a time.  (*Id.*, PageID.427.)  And Dr. Teener said that Fox could sit a total of 3 hours per day, stand for two hours per day, and walk for 2 hours per day.  (*Id.*)

The report also indicated that Fox would be absent more than three days per month.  (*Id.*, PageID.429.)

The report does not indicate whether Fox was present in person in October 2016 for an examination that led to the limitations identified by Dr. Teener.

Finally, in June 2017, Fox returned to the neuromuscular clinic and saw Dr. Nassim Rad, who was supervised by Dr. Teener.  (ECF No. 8-7, PageID.451.)  Dr. Rad conducted physical and neurological examinations of Fox.  (*Id.*)  Dr. Rad noted that Fox was being seen for a follow-up for complaints of muscle pain, cramping and polyneuropathy. (*Id.*)  He also noted that Fox's cramping and tingling were improved by carbamazepine and gabapentin, but said that the etiology of Fox's pain was unclear.  (*Id.*)

Dr. Rad found that Fox's symptoms were stable and unchanged.  Dr. Rad recommended that Fox continue taking carbamazepine, gabapentin and tramadol for pain, and return in a year.  (*Id.*)

Dr. Teener wrote that he agreed with Dr. Rad's assessment.  (*Id.*)

The report associated with this visit to the neuromuscular clinic does not mention a diagnosis of cramp-fasciculation syndrome.

Fox saw other physicians during this time period.  Dr. Thilak Chander, a physician at Lakeview Internal Medicine, was Fox's primary care physician. Fox saw Dr. Chander on multiple occasions from 2014 through 2017.  (*See id.*, PageID.378 (May 15, 2014 appointment), PageID.368 (June 25, 2015

appointment), PageID.364 (Sept. 16, 2015 appointment), PageID.409 (Feb. 18, 2016 appointment), PageID.436 (June 23, 2016), PageID.432 (Feb. 6, 2017 appointment), PageID.447 (Aug. 24, 2017 appointment).)

Dr. Chander noted repeatedly that Fox was morbidly obese. He also repeatedly described Fox's neurological diagnosis as benign cramp-fasciculation syndrome. (*Id.*, PageID. 365, 368, 369, 409, 433, 436, 448.) And Dr. Chander noted that Fox repeatedly declined to use a continuous positive airway pressure (CPAP) machine after a sleep study indicated that Fox would benefit from the use of a CPAP (*id.*, PageID.332-33, 364, 365, 369, 371, 372, 379), and that Fox repeatedly declined bariatric surgery and metformin to treat his diabetes. (*Id.*, PageID.432, 365, 368.)

Dr. Chander's June 25, 2015 report included the following statement:

> Patient continues to have significant problem with cramping pain and patient is not able to perform any type of job at the present time and he will benefit from temporary disability until problem resolves.

(*Id.*, PageID.369.)

Fox was referred for several evaluations. Dr. Wissam El Fallal, a DO at AAA Evaluations in Grosse Ile, MI, saw Fox on January 22, 2016. (*Id.*, PageID.396-401.) Dr. El Fallal completed a physical and neurological examination of Fox.

Fox saw Robert Devers, Psy.D., and Kyle Wood, LLP, at Weber & Devers Psychological Services on January 27, 2016. (*Id.*, PageID.403-07.) Devers and Wood chronicled Fox's history of illness (including his statement

that he suffered from CFS), his personal history, and his description of his daily functioning.  (*Id.*, PageID.403-05.)   They stated their personal observations of Fox as well as their assessment of his mental status, mental capacity and diagnosis.  (*Id.*, PageID.405-06.)   They diagnosed Fox with adjustment disorder with depressed mood, and concluded that he was "able to understand, retain, and follow simple instructions [and] is generally restricted to performing simple, routine tasks." (*Id.*, PageID.406.)  They also concluded that Fox could manage his benefit funds.  (*Id.*)

State agency consultants conducted an examination of the materials then in the record in February 2016 and concluded that Fox was not disabled. (ECF No. 8-3, PageID.150-62.)  The consultants included in their evaluation records from Weber & Devers Psychological Services, AAA Evaluations, Lakeview Internal Medicine, the University of Michigan Health Systems, a dentist in Traverse City, and statements from Mr. Fox himself.  (*Id.*, PageID.151-54.)  This report appears to be signed by Ron Marshall, Ph.D., and Dr. Robert Nelson, M.D.  (*Id.*, PageID.159, 160.)  Regarding Fox's mental health issues, the report concluded that Fox's impairments did not meet the Listing 12.04, Paragraph A, B and C criteria (referring to Listing 12.04 in 20 C.F.R., Part 404, Subpart P, App'x 1).  The report devoted almost three pages to stating Fox's RFC.  (*Id.*, PageID.156-58.)  At the end of this section, the report stated the following:

> **RFC – Additional Explanation**
> Clmt has apparent dx of chronic fasciculation syndrome. He was evaluated by Univ of Mich 1/14/14, w/ latest f/u 6/23/15. He is felt to have a mild underlying myopathy, w/ prominent muscular cramping and fasciculations. The severe cramping is much improved w/ tx w/ carbamazepine. At AP OV 9/16/15, clmt also noted w/ HTN and OSA; has not obtained CPAP. At IMCE 1/22/16, clmt had a mildly antalgic gait, but ambulated w/o any assistive devce. He is morbidly obese, w/ BMI=52.5. No fasciculations were noted at IMCE.
> Clmt is limited to work as described herein.

(*Id.*, PageID.158.)

The report also included the following personalized disability explanation:

> **PERSONALIZED DISABILITY EXPLANATION (PDE)**
>
> **PDE Text:**
> Your condition results in some limitations in your ability to perform work related activities. We have determined that your condition is not severe enough to keep you from working. We considered the medical and other information and work experience in determining how your condition affects your ability to work. We do not have sufficient vocational information to determine whether you can perform any of your past relevant work. However, based on the evidence in file, we have determined that you can adjust to other work.

(*Id.*, PageID.162.)

## III.   Additional Procedural History

As noted above, Fox filed his application for disability and disability insurance benefits on August 15, 2015.  The alleged onset date of disability was August 6, 2015. (ECF No. 8-5, PageID.241.)

In Fox's function report, which is dated September 1, 2015, he identified the following limitations:

- limited to 15 minutes of standing and 15 minutes of sitting (ECF No. 8-6, PageID.277, 282),

- needs to rest several times during the day (*id.*, PageID.277),

- maximum period of work of 2 hours (*id.*),

- needs help with dressing, bathing, clipping nails (*id.*, PageID.278),

- limited to lifting 10 lbs. (*id.*, PageID.282),

- limited to walking 10-20 yards before needing to rest for five minutes (*id.*).

Fox also indicated that he provided some care for his 2-year-old child. (*Id.*, PageID.278.) He wrote that he prepared his own meals daily (but not the family meals), and that he also did laundry and dishes three times a week. (*Id.*, PageID.279.) Fox noted that he shopped for groceries and household products every other week. (*Id.*, PageID.280.) Fox identified hiking, camping, fishing, hunting and shooting as his hobbies. (*Id.*, PageID.281.) He said he did these activities "once a week, more in summer, or during season." (*Id.*)

Fox indicated that his impairments affected his ability to lift, walk, climb stairs, squat, sit, bend, kneel, remember, stand, reach, concentrate, remember, and follow written instructions. (*Id.*, PageID.282.)

He denied the use of any assistive devices such as crutches, canes, or walkers. (*Id.*, PageID.283.)

Fox's claim was denied on February 19, 2016, and Fox requested a hearing. (ECF No. 8-4. PageID.165, 173.) On November 8, 2017, ALJ Gauthier conducted this hearing. (ECF No. 8-2, PageID.85-140). Fox testified. (*Id.*, PageID.85-130, 137-39.) He was represented at this hearing by Attorney Kimberly Lamb. Vocations Expert Bob Hammond also testified. (*Id.*, PageID.131-37.)

During the hearing, Fox said that lived with his wife and three children (ages four, nine, and fourteen) in Sault Ste. Marie, MI. (*Id.*, PageID.95.) At the time of

11

the hearing, he was five feet, eight inches in height and weighed 305 lbs. (*Id*.) Fox said that he drove his car to shop, drop off his wife, and pick up his kids. (*Id*., PageID.97.)

Fox described his work history. He said that his last job was working as a customer service manager at Wal-Mart. He explained that he supervised the front check-outs and cashiers. (*Id*., PageID.100.) Fox said that he lost this job in August 2015 because he was having too many absences due to his pain levels. (*Id*., PageID.102-03.)

The ALJ asked Fox what his most disabling condition was, and Fox responded that it was cramp-fasciculation syndrome. (*Id*., PageID.103.) Fox said this condition began about four years prior. (*Id*., PageID.103.) He said he experienced twitching and cramps, like a "charley-horse." (*Id*., PageID.104.) Fox also said that he was taking medication for the condition, but still experienced cramping at least once per night. (*Id*., PageID.105.) He said that he got the cramps in his quadriceps, but also in his back and shoulders. (*Id*., PageID.105, 107-08.) Fox said that his condition caused muscle fatigue. (*Id*., PageID.107-108.)

Fox also explained what his doctors were telling him. He said his doctors told him that he has a rare neuromuscular disorder and it will not get better. (*Id*., PageID.109.)

Fox said that he could work if he could nap. (*Id*., PageID.110.) But he also said that, apart from his fatigue, his CFS condition would not prevent him from doing

a sedentary job.  (*Id*., PageID.110.)  Fox also said that he experienced body tremors that caused muscle fatigue in every muscle.  (*Id*., PageID.111.)

The ALJ questioned Fox about his fatigue.  Fox said that he was constantly tired from his CFS condition and the medication he was taking.  (*Id*., PageID.112.) Fox said that he slept about seven hours per night and then took about two two-hour naps during the day.  (*Id*., PageID.113.)  Fox said that he had participated in a sleep study and was prescribed a CPAP machine.  He said he could not sleep with the CPAP machine.  (*Id*., PageID.114-116.)

Fox also said he was diagnosed with fibromyalgia.  (*Id*., PageID.117.)

Fox said he was prescribed gabapentin, which, he explained, took away his numbness and tingling, but not the pain.  (*Id*., PageID.118)

Fox said that he had had an EMG to test his nerve conditions in about 2012. (*Id*., PageID.119.)

The ALJ asked Fox about his daily activities.  He said that he gets kids ready for school, drives them to school, and picks them up.  (*Id*., PageID.119.)  He said that a friend comes over and they watch movies.  (*Id*., PageID.119.)  He said that he does laundry and occasionally cooks.  (*Id*., PageID.119-20.)  Fox said he had not hunted "in quite a few years."  (*Id*., PageID.121.)  He also said that he had not participated in his other hobbies in years.  He said he went on a family vacation the previous July to visit his Mother in Mayville, MI.  He said the drive there was four and a half hours. (*Id*., PageID.121.)

13

Fox's attorney asked Fox a series of questions during the hearing.  He said that he could not work for eight hours in a day due to pain.  (*Id.*, PageID.123-124.)  He explained that he has to be able to get up and move.  (*Id.*, PageID.124.)  He said that he needs help putting on his shoes and cutting his finger and toenails.  (*Id.*, PageID.124.)  He said that if he did laundry in the morning, that he would be in pain by afternoon. (*Id.*, PageID.126.)  Fox said that he falls asleep due to his medications and because he is generally fatigued.  (*Id.*, PageID.127.)  Fox rated his level of function as 2 on a scale from zero to 10.  (*Id.*, PageID.129.)

The ALJ resumed questioning Fox, and Fox acknowledged that carbamazepine allowed him to walk and gabapentin eliminated his numbness and tingling.  Fox explained that he still suffered from soreness and pain.  (*Id.*, PageID.130.)

Later in the hearing, Fox said that he also had weakness in his hands.  (*Id.*, PageID.137.)

Six months later, on May 8, 2018, Judge Gauthier issued a decision finding that Fox was not under a disability from August 6, 2015 to the date of decision.  (ECF No. 8-2, PageID.40-56).

On December 20, 2018, the Appeals Council denied review of the ALJ's decision, making it the final decision of the Commissioner of Social Security.  (ECF No. 8-2, PageID.25).

Fox timely filed this action.

## IV.    ALJ's Decision

ALJ Gauthier's seventeen-page decision is the focus of this appeal.  In this decision, ALJ Gauthier stated the five-step sequential process used to determine whether an individual is disabled.  (ECF No. 8-2, PageID.41-42.)

Before stating his findings at each step, the ALJ found that Fox met the insured status requirements of the Social Security Act through December 31, 2020. (*Id.*, PageID.42.)

At step one, the ALJ found that Fox had not engaged in substantial gainful activity since August 6, 2015.  (*Id.*)

At step two, the ALJ found that Fox had the following severe impairments:

- cramp fasciculation syndrome,

- obesity,

- sleep apnea,

- hypertension,

- affective disorder, and

- peripheral neuropathy.

(*Id.*)

The ALJ also noted that Fox had reported that he had been diagnosed with fibromyalgia.  (*Id.*)  But, the ALJ concluded that Fox's fibromyalgia did not constitute a medically determinable impairment.  (*Id.*, PageID.43.)

At step three, the ALJ found that Fox did not have an impairment or combination of impairments that met or medically equaled an impairment listed in

15

20 C.F.R., Part 404, Subpart P, App'x 1.  (*Id*.)  The ALJ noted that he had considered and rejected the following listings:  Listing 11.00, *et seq*., (relating to neurological disorders), Listing 4.00H1 (relating to hypertension); Listing 3.00P (relating to sleep-related breathing disorders), and Listing 12.04 (relating to mental impairments). (*Id*., PageID.43-45.)

Before going on to step 4, the ALJ made findings regarding Fox's RFC.  The ALJ stated the following:

> After careful consideration of the entire record, the undersigned finds that he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except he has additional limitations.[1]  The claimant can push on a frequent basis, but the claimant can only pull on an occasional basis.  The claimant can handle and finger items bilaterally on a frequent basis.  The claimant can never climb ladders, ropes or scaffolds.   The claimant can occasionally stoop, crouch and kneel.  The claimant can never crawl. The claimant can never work at unprotected heights or around moving mechanical parts. The claimant can never work in humidity or wetness and can never work in extreme heat.  With regard to understanding, remembering and carrying out instructions, the claimant can perform simple, routine and repetitive tasks, but not at a production rate pace.

---

[1]     20 CFR § 404.1567 defines different types of work.  1567(a) defines sedentary work as involving lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although sitting is involved, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. By its very nature, work performed primarily in a seated position entails no significant stooping. Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions.

"Occasionally" means occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday. Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles.  SSR 83–10.

> With regard to the use of judgment in the workplace, the claimant can make simple work-related decisions. The claimant can tolerate occasional changes in routine work setting.

(*Id.*, PageID.45-46.)

In determining Fox's RFC, the ALJ considered Fox's description of his symptoms. The ALJ noted that he was utilizing a two-step process to evaluate these symptoms. First, he considered whether Fox's impairments could reasonably be expected to produce Fox's pain and other symptoms. And, second, he considered the intensity, persistence and limiting effects of these symptoms to determine the extent to which they limit Fox's functional limitations. (*Id.*, PageID.46.)

The ALJ outlined Fox's statements from his function report. (*Id.,* PageID.46-47 (citing Exh. 3E, which is included in this record at PageID.277-284).)

The ALJ concluded that Fox's medically determinable impairments could reasonably be expected to cause his alleged symptoms. But the ALJ found that Fox's statements regarding the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. (*Id.*, PageID.47.) The ALJ based his conclusion that Fox's description of his symptoms was inconsistent on three parts of the record. First, the ALJ noted that "[t]he mild physical findings, diagnostic evidence and the course of care the claimant received are inconsistent with the claimant's reported limitations." (*Id.*) Second, the ALJ found that Fox's declination or delayed use of many treatment options – bariatric surgery, a nutrition counselor, metformin to control his blood sugar, tramadol for pain, and a CPAP machine to control his sleep apnea – indicated

that his symptoms were not as severe as he claimed. (*Id.*, PageID.50.) Third, the ALJ found that Fox's "activities of daily living . . . do not support his allegations of disabling symptoms." (*Id.*, PageID.51.) The ALJ specifically identified three aspects of Fox's daily activities that were inconsistent with his description of the intensity, persistence and limiting effects of his symptoms. These were (1) Fox's involvement in providing care for his children, (2) his recent travel for four and a half hours in a car to visit his mother, and (3) his reported cessation of some hobbies despite the lack of evidence that his symptoms were worsening. (*Id.*)

Before providing additional detail regarding Fox's RFC, the ALJ summarized Fox's medical evaluations and diagnoses at the University of Michigan with Doctors Wong and Teener (*id.*, PageID.47-48), Fox's consultative examinations by Dr. El Fallal (*id.*, PageID.48) and Psychologist Devers (*see id.*, PageID.51 (noting that Fox's providers noted "generally normal psychiatric findings")). In addition, the ALJ discussed Fox's obesity, noting that Fox declined bariatric surgery and metformin. (*Id.*, PageID.49.) The ALJ cited SSR 02-1p (2002 WL 34686281 (Sept. 12, 2002)), which has since been rescinded, but set forth the Social Security Administration's policy for evaluating obesity at the time of the ALJ's decision. (*Id.*, PageID.49.) The ALJ also discussed Fox's sleep apnea and noted that Fox was directed to use a CPAP machine in 2014 but did not do so until August 2017. (*Id.*, PageID.50.)

The ALJ then articulated the bases for his findings regarding Fox's RFC. (*Id.*, PageID.51-52.)

The ALJ's decision then turned to stating the weights the ALJ assigned to the opinions stated by the medical sources. First, the ALJ assigned partial or some weight to Dr. Nelson's conclusions about Fox's limitations, and great weight to Ph.D. Marshall's assessment. (*Id.*, PageID.52 (citing Exh. 1A, pages 6-11, which is included in the record at PageID.155-60).)

The ALJ gave partial or little weight to Dr. Teener's opinions and devoted about two full pages to this discussion. (*Id.*, PageID.52-54.) The ALJ focused on two opinions offered by Dr. Teener, whom the ALJ identified as Fox's neurologist. (*Id.*, PageID.52.) First, the ALJ noted that Teener's June 2015 opinion that Fox could not work infringed on a matter reserved to the Commissioner of Social Security, so that opinion was given little weight. Second, the ALJ addressed the opinions Dr. Teener included in his October 2016 RFC assessment form. The ALJ noted that these opinions, in general, were not entirely consistent with the entirety of the record. (*Id.*, PageID.53.) Then the ALJ addressed many of the specific limitations identified by Teener. The ALJ found that Teener's manipulative, reaching, pushing and pulling restrictions were not consistent with Fox's 5/5 strength in all extremities, his ability to button and zip clothing, his ability to touch his nose, his range of motion, and his reported improvement in his symptoms. (*Id.*, PageID.53.) The ALJ noted that Teener's limitations on Fox's ability to operate foot controls and his ability to crouch were not supported by the record. (*Id.*, PageID.53.) The ALJ noted that Teener's opinion that Fox should avoid pulmonary irritants and cold is not supported by any of Fox's conditions. (*Id.*, PageID.53.) The ALJ also found that Teener's conclusion

19

that Fox had a noise level restriction was totally unsupported.  (*Id.*)  The ALJ stated that Teener's view that Fox could not take care of his personal hygiene is not supported by the record.  (*Id.*, PageID.53-54.)  The ALJ stated that Teener's opinion that Fox had to change position every 10-15 minutes conflicted with Fox's testimony that he spent four and a half hours in his car.  (*Id.*, PageID.54.)  The ALJ noted that Dr. Teener's view that Fox would need to nap during the day was also unsupported by the record, based solely on Fox's self-reporting, and inconsistent with Fox's declination of a CPAP machine for years.  (*Id.*, PageID.54.)  The ALJ noted that Dr. Teener's opinion that Fox would be absent for at least three days per month is not explained and not based on anything in the record.  (*Id.*, PageID.54.)  The ALJ noted that Dr. Teener's opinions regarding the severity of Fox's condition were incongruent with the frequency (once per year after 2014) of his visits to the University clinic.  (*Id.*, PageID.54.)  Finally, the ALJ noted that Dr. Teener's opinion was inconsistent with Fox's reports that the prescribed medications were improving his condition.  (*Id.*, PageID.54.)

The ALJ also addressed Psy.D. Devers's opinion, giving it some weight.  The ALJ agreed with some of Devers's opinions, but found that Devers's opinions about Fox's physical limitations were beyond Devers's area of expertise.  (*Id.*, PageID.54.)

The ALJ also gave little weight to Dr. Chander's opinion that Fox would benefit from temporary disability because it infringed on a matter reserved to the Commissioner and did not give a function-by-function analysis.  (*Id.*, PageID.54.)

At step four, the ALJ concluded that Fox could not perform any past relevant work.  (*Id.*, PageID.54-55.)

At step five, the ALJ analyzed Fox's age, education, work experience and RFC, and concluded that there were jobs that existed in significant numbers in the national economy that Fox could perform.  (*Id.*, PageID.55-56.)

The ALJ then reached the conclusion that Fox was not under a disability, as defined in the Social Security Act, from August 6, 2015, through the date of decision on May 8, 2018.  (*Id.*, PageID.56.)

## V.    Standard of Review

Review of an ALJ's decision is limited to two issues: (1) "whether the ALJ applied the correct legal standards," and (2) "whether the findings of the ALJ are supported by substantial evidence."  *Winslow v. Comm'r of Soc. Sec.*, 566 F. App'x 418, 420 (6th Cir. 2014) (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009)); 42 U.S.C. § 405(g).  The Court may not conduct a *de novo* review of the case, resolve evidentiary conflicts, or decide questions of credibility.  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and the Commissioner's findings are conclusive provided they are supported by substantial evidence. 42 U.S.C. § 405(g).

Substantial evidence is defined as more than a mere scintilla of evidence but "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion."  *Jones v. Sec'y of Health & Human Servs.*, 945 F.2d 1365, 1369 (6th Cir.

1991).  In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole, and take into account whatever evidence in the record fairly detracts from its weight. *Richardson v. Sec'y of Health & Human Servs.*, 735 F.2d 962, 963 (6th Cir. 1984) (citations omitted). The substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993).

## VI.    Analysis

Fox argues (1) that the ALJ erred by not properly considering the opinions of Fox's treating physician, (2) that the ALJ erred in his assessment of consistency of Fox's statements, (3) that the ALJ erred in formulating Fox's RFC, and (4) that the ALJ erred by failing to properly consider Fox's obesity.

### A.    Five-Step Sequential Analysis

Generally, the ALJ must employ a five-step sequential analysis to determine whether the claimant is disabled as defined by the Social Security Act. *See* 20 C.F.R. § 404.1520; *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).  At step one, the ALJ determines whether the claimant can still perform substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(i).  At step two, the ALJ determines whether the

claimant's impairments are considered "severe." 20 C.F.R. § 404.1520(a)(4)(ii). At step three, the ALJ determines whether the claimant's impairments meet or equal a listing in 20 C.F.R. part 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(a)(4)(iii). Before proceeding to step four, the ALJ determines the claimant's residual functional capacity (RFC). 20 C.F.R. § 404.1520(e). At step four, the ALJ determines whether the claimant has the RFC to still perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). At step five, after considering the claimant's RFC, age, education, and work experience, the ALJ determines whether a significant number of other jobs exist in the national economy that the claimant can perform. 20 C.F.R. § 404.1520(a)(4)(v). If the ALJ determines the claimant is not disabled under any step, the analysis ceases and the claimant is declared not disabled. 20 C.F.R § 404.1520(a)(4). Here, the ALJ correctly stated this five-step sequential process and then based his decision on it.

### B.    ALJ's Application of Treating Physician Rule

Fox argues that the ALJ violated what is known as the treating physician rule when he decided to give Dr. Teener's opinion partial or little weight. Fox focuses primarily on the ALJ's assessment of Dr. Teener's opinions, but also appears to argue that the ALJ's assessment of Dr. Chander's opinion was flawed.

The ALJ must give controlling weight to a treating physician's medical opinion when (1) the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with the other substantial evidence in the case record." *Gayheart v. Comm'r of Soc. Sec.*, 710

F.3d 365, 375-76 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527).  If an ALJ affords less than controlling weight to a treating source's opinion, the ALJ must provide "good reasons" for discounting the opinion.  *Id.* at 376.  An ALJ must consider the following factors:

1.  length of the treatment relationship and frequency of examinations,

2.  nature and extent of the treatment relationship,

3.  supportability of the opinion,

4.  consistency of the opinion with the record as a whole,

5.  the specialization of the treating source, and

6.  other relevant factors.

*See* 20 C.F.R. §§ 404.1527, 416.927; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th 2004).

But these regulations require "only that the ALJ's decision include 'good reasons ... for the weight ... give[n] [to the] treating source's opinion – not an exhaustive factor-by-factor analysis."  *Francis v Comm'r of Soc. Sec.*, 414 F. App'x 802, 804-05 (6th 2011).  The ALJ is not required to explicitly discuss each of these factors.  Instead, record must reflect that ALJ considered those factors relevant to his assessment.  *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan.19, 2007).  An example of a good reason is that the treating physician's opinion is "unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence." *Conner v. Comm'r of Soc. Sec.*, 658 F. Appx. 248, 253 (6th Cir. 2016).

As noted, the ALJ devoted about two full pages to his discussion of the weight assigned to Dr. Teener's opinions.  (*Id.*, PageID.52-54.)  The medical records indicate that Dr. Teener opined on two occasions that Fox was disabled.  First, in June 2015, Dr. Teener said that Fox could not work.  (ECF No. 8-7, PageID.326.)  Second, in October 2016, Dr. Teener completed an RFC assessment form that identified limitations that, if credited, would lead to the conclusion that Fox was disabled.  (*Id.*, PageID.424-29.)

The ALJ's approach to Dr. Teener's opinions focused on the consistency of Teener's opinions with the rest of the record and the supportability of those opinions. But the ALJ also discussed the frequency of his examinations and identified Dr. Teener as a neurologist.

Substantial evidence in the record supports the ALJ's decision to give partial or little weight to Dr. Teener's opinions for three reasons.

First, substantial evidence supports the ALJ's conclusion that Dr. Teener's opinions were not consistent with specific parts of the record.  (ECF No. 8-2, PageID.53.)  The ALJ identified evidence in the record that was inconsistent with Dr. Teener's opinions on Fox's limitations.  The ALJ correctly noted that the records indicated that Fox had:

- 5/5 strength in all extremities (*see* ECF No. 8-7, PageID.324 (Dr. Wong), PageID.347 (Dr. Wong), PageID.398 (Dr. El Fallal), PageID.420 (Dr. Mundwiler), PageID.451 (Dr. Rad));

- 4.4 kg grip strength in his right hand and 4.5 kg grip strength in his left hand (*id.*, PageID.397 (Dr. El Fallal));

- the ability to button and zip clothing (*id.* (Dr. El Fallal));

- the ability to touch his nose (*id.*, PageID.398 (Dr. El Fallal));

- normal range of motion (*id.*, PageID.398-400 (Dr. El Fallal)); and

- improvement in his symptoms (*id.*, PageID.345 (Dr. Wong), PageID.419 (Dr. Mundwiler), PageID.447 (Dr. Chander).)

(ECF No. 8-2, PageID.53.)

These parts of the record, when viewed in their entirety, are inconsistent the specific limitations Dr. Teener stated in his medical report from June 2015 and his RFC assessment form from October 2016.

Dr. Teener's opinions regarding Fox's limitations are also inconsistent with the observations and opinions of other doctors at the University of Michigan neuromuscular clinic.   In this case, if one were to read only the medical reports written by Doctors Wong, Mundwiler and Rad, who saw Fox at the neuromuscular clinic in 2014, 2016, and 2017 respectively, one would have the impression that Fox's condition was either improving or stable.   In January 2014, Dr. Wong wrote that gabapentin "helped immensely" with Fox's numbness and paresthesias in his feet and hands.  (ECF No. 8-7, PageID.322.)  Wong also concluded that Fox "likely has a benign condition known as cramp-fasciculation syndrome" and reassured Fox that he "should be able to return to full work schedule as soon as [his] symptoms are better controlled."  (*Id.*, PageID.325.)  Four months later, Dr.

Wong reported that Fox's cramping had decreased in both frequency and severity. Fox again said that Fox's prescription for gabapentin helped "immensely" with the numbness and paresthesias affecting his feet and hands. (*Id.*, PageID.345.) In June 2016, Dr. Mundwiler noted that carbamazepine was helping with Fox's cramping, and that gabapentin was helping with Fox's numbness and tingling, but added that the etiology of Fox's pain was unclear. (*Id.*, PageID.419-20.) Dr. Mundwiler identified *benign* fasciculation-cramp syndrome as one of Fox's diagnoses. (*Id.*, PageID.419.) In June 2017, Dr. Rad came to the same conclusions, noting that Fox's cramping and tingling were improved by carbamazepine and gabapentin, and saying that the etiology of Fox's pain was unclear. (*Id.*, PageID.451.) Dr. Rad found that Fox's symptoms were stable and unchanged. (*Id.*)

Dr. Teener adopted the reports or progress notes of Doctors Wong, Mundwiler and Rad, which indicate that Fox had a *benign* form of CFS, and that his symptoms were either improving or stable. (*Id.*, PageID.325, 348, 421, 451.) But then Dr. Teener added two opinions – in June 2015 and October 2016 – indicating that Fox was disabled. As Fox noted in his brief and during oral argument, Dr. Teener is a highly regarded neurologist. The Court does not doubt this point. In this case, however, Dr. Teener's opinions are inconsistent with those of the doctors working with him in the neuromuscular clinic. Some explanation for the variance was necessary. In

the absence of an explanation, substantial evidence supports the ALJ's conclusion that Teener's opinions were inconsistent with the record.

Second, the ALJ's conclusion that some of Dr. Teener's opinions were not supported by evidence in the record is also supported by substantial evidence. The ALJ specifically identified the following aspects of Dr. Teener's opinions as unsupported:

- limitations on Fox's ability to operate foot control and to crouch,

- Fox's need to avoid pulmonary irritants and cold,

- Fox's need to avoid loud environments,

- Fox's inability to take care of his personal hygiene,

- Fox's limited ability to sit without changing positions,

- Fox's need to nap during the day, and

- Fox's need to be absent from work for at least three days per month.

(ECF No. 8-2, PageID.53-54.)

The ALJ's conclusions on the lack of support for these points are correct and are supported by substantial evidence.

Dr. Teener's opinions on Fox's personal hygiene and need to change positions frequently could also be viewed as inconsistent. A review of the record indicates that none of the treating sources noted that Fox needed to change positions frequently. In addition, Fox told Psy.D. Devers that he did not need assistance to prepare for his appointment with Devers, and Devers found that Fox's hygiene and clothing were within normal limits. (ECF No. 8-7, PageID.405.)

28

In general, Dr. Teener did little to explain the bases for his opinions.  As noted above, Dr. Teener first opined that Fox was disabled in June 2015.  (ECF No. 8-7, PageID.326, which is also appears to be included in the record at PageID.348-49.)  This report articulates time limitations on Fox's ability to stand and walk.  Dr. Teener's report from June 2015 indicates that this visit lasted some 30 minutes, the majority of which was devoted to counseling and care planning.  (*Id*. PageID.326.)  The medical records from the June 2015 visit to the neuromuscular clinic do not indicate that a physical examination or testing was conducted and do not indicate the source of the limitations.

The same conclusion applies to the RFC assessment form Dr. Teener completed in October 2016.  In response to the form's question about the basis for the assessment, Dr. Teener simply wrote "see visit notes."  (*Id*.)  the medical records before the Court do not include visit notes associated with this RFC assessment.  In fact, the report does not indicate whether Fox was present in person in October 2016 for an examination that led to the limitations identified by Dr. Teener.  Thus, the ALJ correctly concluded that this RFC assessment was unsupported.

Finally, the ALJ concluded that the frequency of Fox's visits to the neuromuscular clinic were inconsistent with the number of absences from work – at least three per month – Dr. Teener forecast.  (ECF No. 8-2, PageID.54.)  Frequency of visits is one of the factors to be considered in determining what weight to give to a medical source's opinion.  *Wilson*, 378

F.3d at 544.  The medical records indicate that Fox was directed to return to the neuromuscular clinic for a follow-up on a yearly basis, or sooner if necessary, beginning in May 2014.  (ECF No. 87-7, PageID.348 (May 2014 appointment), PageID.326 (June 2015 appointment), PageID.421 (June 2016 appointment), PageID.451 (June 2017 appointment).)  The record before the Court indicates that Fox did not return early to the clinic out of necessity.  He simply returned on an annual basis.  As outlined above, the reports from Doctors Wong, Mundwiler, and Rad indicate that Fox's condition was either improving or stable.  The Court recognizes that the trip from Sault Ste. Marie to Ann Arbor is a long one. Nevertheless, Fox's decision to return annually from May 2014 through June 2017 supports the conclusion that his condition was not deteriorating.

The Court recognizes that Dr. Teener, who worked at the neuromuscular clinic at the University of Michigan, is a leader in his field.  It is important to note that the ALJ in this case did not challenge Dr. Teener's opinion that Fox suffered from either CFS or benign CFS.  Instead, the ALJ gave little or partial weight to Dr. Teener's opinions regarding the limitations this diagnosis caused.  The ALJ gave good reasons for the weight he gave to Teener's opinion as to Fox's limitations, and these reasons are supported by substantial evidence.

Fox also argues that the ALJ assigned too little weight to Dr. Chander's opinion that Fox be placed on temporary disability until his problems resolved.  Dr. Chander wrote the following:

> Patient continues to have significant problem with cramping pain and patient is not able to perform any type

30

of job at the present time and he will benefit from
temporary disability until problem resolves.

(ECF No. 8-7, PageID.369.)  Dr. Chander gave this opinion on June 25, 2015, which

is before Fox's alleged disability onset date.  The ALJ correctly noted that Dr.

Chander's opinion did not include a function-by-function analysis of Fox's abilities,

and that his opinion infringed on a matter reserved to the Commissioner.  (ECF No.

8-2, PageID.54.)  In addition, Dr. Chander repeatedly noted that Fox suffered from

*benign* CFS.  (*Id.*, PageID.369, 365, 409, 432-33.)  Thus, the ALJ had good reason to

give Dr. Chander's opinion little weight.

### C.  The ALJ's Assessment of the Consistency of Fox's Statements Regarding the Intensity, Persistence and Limiting Effects of his Impairments

As set forth above (*see supra*, pages 10-11), Fox identified numerous limitations

on his ability to work in the function report he completed on September 1, 2015, and

during his testimony before the ALJ on November 8, 2017.  These statements, if

credited, would establish that Fox was disabled.

The ALJ found that Fox's statements regarding the intensity, persistence and

limiting effects of his symptoms were inconsistent with the record.  (*Id.*, PageID.46.)

The ALJ's conclusions regarding the consistency of Fox's statements were based on

three aspects of the record:  (1) the mild physical findings, diagnostic evidence and

the course of care the claimant received (*id.*, PageID.47), (2) Fox's declination or

delayed use of many treatment options – bariatric surgery, a nutrition counselor,

metformin to control his blood sugar, tramadol for pain, and a CPAP machine to

control his sleep apnea (*id.*, PageID.50), and (3) Fox's activities of daily living (*id.*,

31

PageID.51).  The ALJ focused on three aspects of Fox's daily activities:  (1) Fox's involvement in providing care for his children, (2) his recent travel for four and a half hours in a car to visit his mother, and (3) his reported cessation of some hobbies despite the lack of evidence that his symptoms were worsening.  (*Id*.)

An ALJ's factual findings concerning a claimant's subjective symptoms are peculiarly within the province of the ALJ.  *Gooch v. Secretary of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987).  The Court does not make its own credibility determinations.  *Walters v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997).  The Court's "review of a decision of the Commissioner of Social Security, made through an administrative law judge, is extremely circumscribed[.]"  *Kuhn v. Commissioner*, 124 F. App'x 943, 945 (6th Cir. 2005).  The Commissioner's findings are reviewed under the "substantial evidence" standard.  This is a "highly deferential standard of review."  *Ulman v. Commissioner*, 693 F.3d 709, 714 (6th Cir. 2012). Claimants challenging the ALJ's findings "face an uphill battle."  *Daniels v. Commissioner*, 152 F. App'x 485, 488 (6th Cir. 2005).  The Court must accord the ALJ's findings "great weight and deference particularly since the ALJ has the opportunity, which [the court] d[oes] not, of observing a witness's demeanor while testifying."  *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 476 (6th Cir. 2003); *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001).

But the Sixth Circuit recognizes that meaningful appellate review requires more than a blanket assertion by an ALJ that "the claimant is not believable."  *Rogers v. Commissioner*, 486 F.3d 234, 248 (6th Cir. 2007).  The *Rogers* court observed that

the ALJ must explain his credibility determination and that the explanation " 'must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.' " *Id.* (quoting *Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Assessing Disability Claims: Assessing the Credibility of an Individual's Statements, SSR 96-7p* (reprinted at 1996 WL 374186, at *4 (SSA July 2, 1996)).

The Court will address each aspect of the ALJ's consistency findings in order. First, substantial evidence supports the ALJ's conclusion that Fox's description of the impact of his impairments are inconsistent with the mild physical findings in the record, the diagnostic evidence and the course of care he received.  Fox criticizes this aspect of the ALJ's opinion as "boilerplate."  (ECF No. 15, PageID.481.)  But a review of the record indicates that the ALJ rested this opinion on numerous, specific pieces of evidence from the record.  The ALJ relied on Dr. Wong's description of Fox's neurological history prior to coming to the University of Michigan neuromuscular clinic, which, as the ALJ correctly noted, showed mild findings.  (*See* ECF No. 8-2, PageID.47 (citing ECF No. 8-7, PageID.322 (Dr. Wong description of Fox's history).)  The ALJ also referenced Dr. Wong's initial physical and neurological examinations, which showed normal findings with the exception of fasciculations.  (*See* ECF No. 8-2, PageID.47 (citing ECF No. 8-7, PageID.324-25).)    And the ALJ noted that the

fasciculations were attributable to a benign CFS.[2]   (*See* ECF No. 8-2, PageID.47 (citing ECF No. 8-7, PageID.325).) (Dr. Wong description of Fox's history).)  Indeed, the ALJ went on to accurately chronicle the numerous mild or normal findings in the medical records generated by doctors at the neuromuscular clinic and Doctors El Fallal and Chander from 2014 through June 2017.  (*See* ECF No. 8-2, PageID.47-49.) As outlined above, the medical reports written by Doctors Wong, Mundwiler, and Rad (and approved by Dr. Teener) indicate that Fox's condition was either improving or stable, that carbamazepine was helping with Fox's cramping, that gabapentin was helping with Fox's numbness and tingling, and that Fox's CFS was benign.   The ALJ may have used phraseology that has become boilerplate to introduce this section.   But he based his overall conclusions regarding the inconsistency of Fox's statements with the medical records on substantial evidence.

Second, the ALJ's conclusion that Fox's declination or delayed use of many treatment options (*id.*, PageID.50) showed an inconsistency with his claimed symptoms is also supported by the record.  As an initial matter, the ALJ correctly pointed out that the records show that Fox declined or delayed bariatric surgery (ECF No. 8-7, PageID.365, 368, 396, 412), a nutrition counselor (PageID.396), metformin to control his blood sugar (PageID.432), tramadol for pain (PageID.419, 451), and a CPAP machine to control his sleep apnea (PageID.364, 369, 371, 372, 409).  In his brief, Fox argues that these remedies may not be effective and essentially suggests

---

[2]     In fact, Fox's CFS was identified as "benign" throughout the medical records. (*See* ECF No. 8-7, PageID.325 (Dr. Wong and Dr. Teener); PageID.365, 368, 369, 409, 411, 433, 436, 448 (Dr. Chander); PageID.419 (Dr. Mundwiler).)

that Fox's declination of these options should not be held against him.  The Social Security Administration cannot require a claimant to pursue and exhaust every possible remedy before qualifying for disability.  But it is also entirely reasonable for an ALJ to note what treatment options a claimant has pursued and which he has declined when assessing the consistency of the claimant's statements regarding the intensity, persistence and limiting effects of his conditions.  The ALJ did so here, and his conclusions are supported by substantial evidence.

Third, the ALJ considered Fox's statements regarding his daily life and found these statements to be inconsistent with his description of his symptoms.  (*Id.*, PageID.51.)  The ALJ's conclusions on this point are also supported by substantial evidence.  Again, it is important to note that the evidence on which the ALJ relied was, in fact, a part of the record.  The record shows (1) that Fox was involved in providing care for his children (ECF No. 8-6, PageID.278, ECF No. 8-2, PageID.119-20), (2) that Fox had recently driven or ridden in a car for four and a half hours to visit his mother (*id.*, PageID.121), and (3) that, during the hearing in November 2017, he reported that he had stopped his participation in some hobbies despite the lack of evidence that his symptoms were worsening.  (*Compare* ECF No. 8-6, PageID.281 (function report dated Sept. 1, 2015, in which Fox stated that he engaged in his hobby activities "once a week, more in summer, or during season") *with* ECF No. 8-2, PageID.121 (Fox's testimony on Nov. 8, 2017, at which time he stated that he no longer engaged in hobbies).)

An ALJ may take into account a claimant's daily activities, included whether the claimant cares for school-aged children and performs household chores. *Moore v. Comm'r of Soc. Sec.*, 573 F. App'x 540, 543 (6th Cir. 2014). Thus, the ALJ's review of Fox's involvement in raising his kids and doing household chores was reasonable, and his conclusions were supported by substantial evidence.

The last point on Fox's hobbies deserves additional comment. Fox cites to Magistrate Judge Carmody's opinion in *Birdsell v. Comm'r of Social Security*, W.D. Mich. Case No. 1:16-cv-1390, for the proposition that an ALJ may not require a claimant to give up all hobbies in order to qualify for social security. But that is not what the ALJ has done here. The ALJ has pointed out an inconsistency between what Fox said in his function report and how he testified in his hearing, and found that Fox's reported cessation of hobbies was not supported by worsening symptoms. Although the ALJ did not use the term "credibility," he has essentially found that Fox's November 2017 testimony lacks credibility. As explained above, the records in the case do not indicate that Fox's symptoms were worsening. Thus, the ALJ's conclusions regarding Fox's consistency (or credibility) is supported by substantial evidence.

"[A]n ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability. *Jones*, 336 F.3d 469, 476 (6th Cir. 2003). Here, the ALJ found that Fox's statements regarding the intensity, persistence and limiting effects of his symptoms were inconsistent with the record. (*Id.*, PageID.46.) The ALJ's conclusions were

based on a comparison between the intensity, persistence and limiting effects of Fox's claimed symptoms and (1) the medical evidence in the record, (2) Fox's declination or delayed use of many treatment options, and (3) Fox's activities of daily living. The ALJ's conclusions in this regard are supported by substantial evidence.

### D. ALJ's Assessment of Fox's Obesity

Fox argues that the ALJ did not correctly analyze his extreme obesity, and, as a result, made an error in formulating his RFC. The Court disagrees for several reasons.

SSR 02-1p (2002 WL 34686281 (Sept. 12, 2002)) does not mandate a particular mode for analyzing a claimant's obesity. *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006). But, this SSR does indicate that a claimant's obesity should be considered when formulating the claimant's RFC, especially when a claimant also suffers from sleep apnea. 2002 WL 34686281 at *6.

The record before the Court indicates that the ALJ did consider Fox's obesity in several ways. First, the ALJ listed Fox's obesity as a medically determinable impairment that was severe. (ECF No. 8-2, PageID.42.) Second, the ALJ cited to SSR 02-1p and National Institute of Health (NIH) guidelines on obesity. Third, the ALJ discussed Fox's obesity and the advice he had been given to address it. (*Id.*, PageID.49.) The ALJ correctly noted that the records in the case indicated that Fox had declined many of the treatment options presented to him to address his obesity. (*See id.*, citing PageID.368, 396 and 412 (noting Fox declined bariatric surgery), PageID.432 (noting Fox declined advice to take metformin to control blood sugar),

PageID.396 (noting Fox had not consulted with a weight loss counselor).)  Fourth, the ALJ specifically included Fox's obesity in the calculation of his RFC.  (*See* ECF No. 8-2, PageID.51 (stating that the environmental limitations were included in the RFC in consideration of Fox's obesity).)  Finally, the ALJ gave great weight to an RFC assessment completed by state agency consultants.  (ECF No. 8-2, PageID.52.) Their RFC assessment referenced Fox's obesity yet still found that he was not disabled. (ECF No. 8-3, PageID.158.)

Thus, there is substantial evidence in the record to support the conclusion that the ALJ correctly evaluated Fox's obesity.

### E.    ALJ's Assessment of Fox's RFC

Fox asserts that the ALJ erred in formulating his RFC.  Fox points out that an ALJ must consider a claimant's limitations in assessing RFC, and he asserts that ALJ Gauthier's RFC assessment was wrong because the ALJ did not account for the limitations identified by Dr. Teener.  (ECF No. 15, PageID.482.)

RFC is the most, not the least, a claimant can do despite his impairments.  20 C.F.R. §§ 404.1545(a), 416.945(a)(1); *Branon v. Comm'r of Soc. Sec.*, 539 F. App'x 675, 677 n.3 (6th Cir. 2013); *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007).  RFC is an administrative finding of fact reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Deaton v. Comm'r of Soc. Sec.*, 315 F. App'x 595, 598 (6th Cir. 2009).  While the RFC determination is made by the ALJ, an ALJ's RFC determination must be supported by substantial evidence.  *Torres v. Comm'r of Soc. Sec*, 490 F. App'x 748, 754 (6th Cir. 2012).  If the record contains "conflicting

evidence that would suggest further limitations, under the substantial evidence standard, administrative findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion." *Id.*

The Court has already concluded that substantial evidence supports the ALJ's decision to give little weight to Dr. Teener's opinions regarding Fox's limitations. (*See supra*, pages 24-30.) Thus, the ALJ's RFC assessment is not erroneous simply because it did not include limitations identified Dr. Teener.

In addition, a review of the record indicates that the ALJ's RFC assessment is supported by substantial evidence. "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8P, 1996 WL 374184 (July 2, 1996). The ALJ complied with these requirements here. The ALJ stated his assessment of Fox's RFC at pages 6-7 (ECF No. 8-2, PageID.45-46) of his decision. The ALJ concluded that Fox could perform sedentary work with a number of limitations. (*Id.*) Later in the decision, the ALJ reviewed the limitation he had identified and tied all but one of them to one or more of Fox's severe and non-severe impairments. (*Id.*, PageID.51-52.)

First, the ALJ concluded that Fox was limited to sedentary work due to his inability to sustain the lifting or carrying requirements of light or greater exertional work. (*Id.*, PageID.51.)

Second, the ALJ explained the limitations of Fox's ability to push and pull were based on Fox's report of neuropathy in his hands, but also on the full range of motion

Fox demonstrated in his hands, elbows and shoulders; his full strength in his upper extremities; his 4 to 4.5 kg grip strength; and Fox's reports that prescribed medications were helping. (*Id.*)

Third, the ALJ found that Fox could handle and finger bilaterally on a frequent basis. (*Id.*) The ALJ did not point to a specific point in the record that would support this conclusion. But evidence of Fox's grip strength, full strength in his upper extremities and full range of motion in his hands would support this conclusion. In addition, on this point, only Dr. Teener and Fox himself said that Fox was limited to handling and fingering occasionally. The ALJ, however, had good reasons to give Dr. Teener's opinions little weight and to find that Fox's description of his symptoms was inconsistent with the record. The claimant has the burden of proving the existence and severity of limitations caused by his impairments and that he is precluded from performing past relevant work through step four, *Jones*, 336 F.3d at 474, and Fox has failed to meet that burden here.

Fourth, the ALJ found that Fox could not climb ladders, ropes or scaffolds. The ALJ attributed this limitation to Fox's CFS, obesity, neuropathy, hypertension and fatigue. (ECF No. 8-2, PageID.51.)

Fifth, the ALJ found that Fox could occasionally stoop, crouch and kneel, but never crawl, based on his normal range of motion and full strength in his extremities balanced against some loss of sensation in his lower extremities and his obesity and fasciculations. (*Id.*)

Sixth, the environmental limits the ALJ imposed in his RFC assessment – that Fox can never work at unprotected heights, around moving mechanical parts, in humidity, wetness or extreme heat – were necessitated by Fox's hypertension, obesity and fatigue.  (*Id.*, PageID.51-52.)

Finally, the ALJ restricted Fox to simple, routine and repetitive tasks, but not at a production rate pace based on Fox's fatigue and affective disorder.   (*Id.*, PageID.52.)

Relatedly, Fox argues that the vocational expert's responses to the ALJ's questions require reversal.  (ECF No. 15, PageID.482-83.)  Fox points out that the vocational expert (VE) testified that a limitation of occasional handling would eliminate sedentary work.  (*Id.*)  The hearing transcript confirms that the VE testified that a person who could handle bilaterally on an occasional basis would not be able to do sedentary work.  (ECF No. 8-2, PageID.135.)

Fox's argument on this point assumes that Fox can only handle bilaterally on an occasional basis.  The record indicates that Dr. Teener concluded that Fox could handle and finger on an occasional basis.  (ECF No. 8-7, PageID.425 (Dr. Teener's RFC assessment form).)   In addition, during Fox's hearing before the ALJ, Fox testified that he had difficulty handling.  (ECF No. 8-2, PageID.136.)  But, as explained above, the ALJ gave good reasons supported by substantial evidence for giving Dr. Teener's limitations little weight, and for finding that Fox's description of his symptoms was inconsistent with the record.

The transcript indicates that the ALJ asked the VE about two hypothetical individuals.  (*Id.*, PageID.132-36.)  The first individual had the limitations identified by the ALJ in Fox's RFC, including the ability to handle and finger bilaterally on a frequent basis.  (*Id.*, PageID.133.)  The VE opined that the first hypothetical person would not be able to do Fox's past work, but would be able to do other jobs that existed in significant numbers in the national economy.  (*Id.*, PageID.133-34.)  The second hypothetical individual had additional limitations.  This person could only handle bilaterally on an occasional basis.  The VE concluded that this person could not do sedentary work.  (*Id.*, PageID.135.)

The questions the ALJ asked the VE about the first hypothetical individual incorporated the functional limitations the ALJ found credible.  As noted, the ALJ's RFC assessment for Fox was supported by substantial evidence.  Thus, the VE's testimony regarding the hypothetical individual with greater limitations does not necessitate reversal.  *See Winslow*, 566 F. App'x at 421 (stating that "[t]he record reflects . . . that the hypothetical questions were proper because the ALJ incorporate all of the functional limitations that she deemed credible"); *Jones*, 336 F.3d at 476 (stating that "the ALJ can present a hypothetical to the VE on the basis of his own assessment if he reasonably deems the claimant's testimony to be inaccurate).

## VI.  Conclusion

In this case, the ALJ gave good reasons for giving little weight to the opinions of Fox's neurologist, Dr. Teener.  The ALJ did not question Dr. Teener's diagnoses.  Instead, the ALJ found that Dr. Teener's opinions regarding Fox's functional

limitations were inconsistent with other evidence in the record, unsupported by medical evidence, and incongruent with the frequency of Fox's visits with Dr. Teener. Substantial evidence supports each of these reasons.   In addition, substantial evidence supports the ALJ's conclusion that Fox's description of the intensity, persistence and limiting effects of his symptoms were inconsistent with the evidence in the record.   Furthermore, the record indicates that the ALJ did not err when he assessed Fox's obesity.   Finally, as a result of these conclusions, the ALJ's RFC assessment is supported by substantial evidence.   Accordingly, Administrative Law Judge Gauthier's decision is affirmed.

/s/ *Maaten Vermaat*
Maarten Vermaat
U. S. MAGISTRATE JUDGE

Dated:  April 21, 2020